01

02

03  **05-CV-01136-MEM**

04

05

06  UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
07  AT SEATTLE

08  DEREK ANDREW, INC.,
                                            )   Case No. C05-1136-JPD
09          Plaintiff,                      )
                                            )
10      v.                                  )
                                            )   FINDINGS OF FACT AND
11                                          )   CONCLUSIONS OF LAW
    POOF APPAREL CORPORATION,               )
12                                          )
            Defendant.                      )
13  _____)

14          This case was tried to the Court on December 4 and 5, 2006. Pursuant to Fed. R. Civ.

15  P. 52(a), the Court issues the following findings of fact and conclusions of law:

16                          FINDINGS OF FACTS

17          1.      Derek Andrew, Inc. ("Derek Andrew") is a Washington corporation with its

18  principal place of business in the State of Washington. Derek Andrew sells women's clothing

19  to customers throughout the United States. It began operations in 1995 and has grown from 4

20  employees initially to 35 employees in 2006.

21          2.      Poof Apparel Corporation ("Poof Apparel") is a New York corporation with its

22  principal place of business in the State of New York. Poof Apparel sells women's clothing to

23  retail and other customers throughout the United States. Poof Apparel began operations in

24  2003, and had sales of approximately $28 million in 2006, including sales to stores such as

25  The Wet Seal, Inc. and Group USA, Inc., all of which have retail stores carrying the Poof

26  Apparel line of clothing within this jurisdiction.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 1

01      3.    Derek Andrew filed its complaint against Poof Apparel, The Wet Seal, Inc.,
02 and Wet Seal G.C., Inc. on June 22, 2005, asserting claims of relief for copyright and
03 trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Copyright Act,
04 17 U.S.C. § 101 *et seq.*, the Washington Consumer Protection Act (WCPA), R.C.W. § 19.86
05 et seq., and common law trademark. Poof Apparel received service of the summons and
06 complaint on June 27, 2005.

07      4.    Poof Apparel did not file an answer to the complaint.

08      5.    On August 8, 2005, Derek Andrew filed a motion for default.

09      6.    Default was entered against Poof Apparel on August 8, 2005, pursuant to Fed.
10 R. Civ. P. 55(a). Dkt. No. 8. On March 23, 2006, Poof Apparel filed a motion to set aside the
11 default. Dkt. No. 24. This motion was denied by this Court's Report and Recommendation
12 of April 14, 2006, which was adopted by the Honorable Thomas S. Zilly's Order dated June
13 19, 2006. Dkt. No. 31.

14      7.    Accordingly, this case proceeded to trial on the issue of the damages at law
15 and/or relief in equity.

16      8.    Derek Andrew sells many of its products in association with its "Twisted
17 Heart" and "Heart Design" trademarks. The Twisted Heart brand has proven to be a popular
18 success for Derek Andrew. It is evidenced by a "hangtag" of high quality. The Twisted Heart
19 hangtag is attached to all Derek Andrew garments in the Twisted Heart line. This mark is
20 used to promote the sale of Derek Andrew's products throughout the United States. The mark
21 has become well-known and Derek Andrew's products are associated with the marks in the
22 minds of consumers.

23      9.    The Twisted Heart hangtag is a high-quality hangtag. It is made from heavy
24 gauge paper, includes a metal eyelet, has five-color printing, is dye-cut and has a satin ribbon
25 that attaches the hangtag to the garment. This provides a strong visual impact to assist in
26 brand development and recognition. Ex. 77.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 2

01   10.  The Derek Andrew "Twisted Heart" line is a women's sport line of clothing
02 directed to higher end, quality and fashion-conscious consumers. The product line retails
03 from about $70 to $200 per item, and is sold at department stores such as Nordstrom, Saks 5th
04 Avenue, and Niemann Marcus.

05   11.  The Derek Andrew hangtag in question is the subject of United States
06 Copyright Registration No. VA 1-301-899, with a registration date of June 15, 2005.
07 Amended Complaint, Ex. B.

08   12.  Poof Apparel wholesales a line of female junior sportswear clothing. The
09 typical age demographic for its customers is 14 to 28. The marketing focus is a moderately
10 priced garment with a good fit. The wholesale cost of Poof Apparel products is often between
11 $2 to $5 per item to the retailer. Poof Apparel sells products which often do not have a long
12 lifeline. Its business is very fast moving. Poof Apparel's retail customers include Boscov's
13 Department Stores, The Wet Seal, Jobber1, Group USA, Marshall's, Mandees, Marianne's,
14 Rainbow, 579, Joyce Leslie, Century 21, Value City, and T.J. Maxx.

15   13.  Poof Apparel's clothes are primarily manufactured abroad, including in the
16 People's Republic of China. One of Poof Apparel's main factories in China is Dandong
17 Huayang Textiles and Garments Company Limited ("Dandong").

18   14.  Once the garments are made, they are shipped to Poof Apparel's warehouse
19 facility in Jersey City, New Jersey, known as Phoenix Warehouse, where the garments are
20 stored until they are shipped to retail customers.

21   15.  For all garments sold to Boscov's Department Stores, Poof Apparel places an
22 individual price ticket on each garment before they are shipped from Poof Apparel's New
23 Jersey warehouse to Boscov's.

24   16.  Poof Apparel's overseas factories produce clothing samples to Poof Apparel's
25 specifications, from which Poof Apparel chooses the styles of garments it wishes to add to its
26 product line.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 3

01      17.    Poof Apparel uses samples produced by its factories to sell those designs to its
02 customers.

03      18.    Poof Apparel provides detailed manufacturing specifications to its factories in
04 connection with the manufacture of each style of garment the factories produce for Poof
05 Apparel.

06      19.    Dandong has its own quality control system in connection with its
07 manufacturing of clothing for Poof Apparel. It ships garments to Poof Apparel in large
08 quantity containers from overseas to the United States.

09      20.    Poof Apparel occasionally performs spot checks of garments before they are
10 shipped from Dandong to Poof Apparel in the United States.

11      21.    Sometime at the end of 2004 or beginning of 2005, Poof Apparel sent Derek
12 Andrew clothing with a Twisted Heart hangtag to its agent in China for purposes of producing
13 similar articles of clothing, to be sold under the Poof Apparel brand.

14      22.    When the finished garments were received by Poof Apparel, they included a
15 cheap facsimile of the Twisted Heart hangtag attached to the garments, with the word "Poof!"
16 substituted for "Twisted Heart." Ex. 78.

17      23.    Poof Apparel admits that the "Poof" hangtag that is the subject of this suit
18 infringes Derek Andrew's intellectual property rights. Even without the admission, the Court
19 finds that the two hangtags are substantially similar for purposes of copyright infringement
20 and that, as used in commerce, are likely to and have led to confusion in the marketplace,
21 notwithstanding the price-point differential, for purposes of trademark infringement.
22 *Compare* Ex. 77, *with* Ex. 78.

23      24.    On May 17, 2005, Derek Andrew's counsel sent a cease and desist letter to
24 counsel for Poof Apparel to address concerns about sales of clothing bearing the infringing
25 hangtag. On May 24, 2005, Marc Kaplan, counsel for Poof Apparel, responded seeking
26 additional information regarding Derek Andrew's intellectual property. Ex. 102. Additional

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 4

01 | information was provided by Derek Andrew, and on June 7, 2005, Mr. Kaplan wrote that Poof

02 | Apparel understood the concerns raised by Derek Andrew's counsel,

03 | and do not wish to interfere with your client's intellectual property rights.
Accordingly, we plan on complying fully with the cease and desist
04 | demand in the Letter regarding any and all items bearing the "Heart Design"
trademark and label in question as referenced in the Letter.
05 | We will speak with our client and come up with a timetable for the
prompt removal from the market place of any and all items bearing the "Heart
06 | Design" trademark and the label in question.

07 | Ex. 1.

08 |     25.    Subsequently, on June 22, 2005, Derek Andrew filed a complaint against Poof

09 | Apparel. Dkt. No. 1. On June 24, 2005, in a letter misdated June 7, 2005, Mr. Kaplan wrote:

10 | Your client's concerns are understandable and it was not my client's
intention to interfere with your client's intellectual property rights.
11 | We must emphasize that we are in the process of complying fully with
the cease and desist demand in the Letter regarding any and all items bearing
12 | the "Heart Design" trademark and the label in question as referenced in the
Letter.
13 | The client has discontinued production of any and all items bearing the
"Heart Design" trademark and the label in question. Further, our client is
14 | presently attempting to recall from distributors any and all items bearing the
"Heart Design" trademark and the label in question.

15 | Ex. 2.

16

17 |     26.    On June 29, 2005, Mr. Kaplan sent Derek Andrew's counsel a sample of the

18 | garment sold under the Poof Apparel label with the infringing hangtag. Ex. 105.

19 |     27.    Upon receipt of the cease and desist letter in May, 2005, Elliot Terzi, the

20 | president of Poof Apparel, testified that he contacted Cheung Lam Wah, Poof Apparel's agent

21 | in China. He advised his agent to stop making the infringing hangtags and inquired as to the

22 | quantity produced. He testified that he was led to believe that approximately 5,000 infringing

23 | hangtags were produced, and of those, approximately 3,750 had been attached to garments

24 | shipped to the United States. He also testified that the garments would have been scattered in

25 | the Poof Apparel warehouse among a line of many separate products. Accordingly, he

26 | believed it would not have been possible to retrieve the garments bearing the infringing

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 5

01 | hangtags, and further that the quantity of infringing hangtags was too small to justify the time
02 | it would take to retrieve the garments and remove the hangtags.

03 |     28.    Notwithstanding the assurances of Mr. Kaplan in Exhibit 104 that Poof
04 | Apparel was attempting to recall garments bearing the infringing hangtags from distributors, it
05 | did nothing of the sort. Instead, it hoped that all the products would be sold without further
06 | discovery. Mr. Terzi testified that it would not have been possible to locate the items with the
07 | infringing hangtags. Mr. Terzi's testimony is not credible in this regard. On June 29, 2005, in
08 | response to the complaint being filed in this case, Mr. Kaplan was able to send a sample of a
09 | Poof Apparel product bearing the infringing hangtag to counsel for Derek Andrew. Ex. 105.
10 | No explanation was offered as to how Poof Apparel could locate and send one such garment
11 | in short order and the remaining garments could not be found, if Poof Apparel had a genuine
12 | interest in doing so.

13 |     29.    While shopping with her daughter on May 9, 2005, Christina Alexander, a
14 | Derek Andrew design director, noticed approximately 30 to 50 Poof Apparel satin tops in a
15 | women's apparel store at the Group USA Super Mall located in Auburn, Washington, each
16 | bearing the infringing hangtag. Ms. Alexander purchased one of these garments. *See* Ex. 69
17 | (item), Ex. 70 (receipt). On June 4, 2005, after hearing about the possibility of an infringing
18 | Twisted Heart hangtag, Cynthia Federman, Vice President and co-owner of Derek Andrew,
19 | noticed approximately 40 Poof Apparel garments bearing the infringing hangtags displayed
20 | for sale at The Wet Seal retail clothing store in the Alderwood Mall in Lynnwood,
21 | Washington. Ms. Federman purchased one of those garments—a pair of black capri pants
22 | with floral embroidery. *See* Ex. 67 (item), Ex. 68 (receipt). While shopping at the same store
23 | on August 17, 2005, Brianna Gutierrez, a Derek Andrew design director, discovered
24 | approximately 40 additional grey capri pants made by Poof Apparel bearing the infringing
25 | tags. Ms. Gutierrez purchased one of these items. *See* Ex. 65 (item), Ex. 66 (receipt).

26 |     30.    While Poof Apparel sells to retail chains and stores nationwide, most of its

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 6

01 | business occurs on the East Coast of the United States.

02 | 31. Poof Apparel produced no records establishing the number of garments
03 | distributed with the infringing hangtags, despite legal requests for such information from
04 | Derek Andrew. Poof Apparel's business has expanded from birth in 2003 to over $28 million
05 | in 2006. However, it claims that it's record-keeping processes and computer capabilities
06 | prevent it from producing appropriate documents regarding the number of garments. It strains
07 | credibility to believe that a wholesale business with thousands of accounts and lines of
08 | garments, and one that is doing over $28 million in business, would not have the necessary
09 | record-keeping mechanisms sufficient to track inventory for the purposes of determining
10 | accurate sales of garments involving infringing hangtags.

11 | 32. In the course of discovery, Derek Andrew asked for information relating to the
12 | name of Poof Apparel's agent in China who could provide additional information regarding
13 | shipments to Poof Apparel. Poof Apparel did not provide this information, even after stating
14 | it would. Poof Apparel did not call its Chinese agent to testify at the trial. Instead, it relied
15 | exclusively on statements made by Mr. Terzi to try to identify quantities. Mr. Terzi had no
16 | personal knowledge of the quantities of garments sold and was not competent to testify on this
17 | matter. Mr. Terzi's claims that only 3,750 garments would have been sold that bore the
18 | infringing hangtag are simply not credible, for at least the following reasons:

19 | (A) The initial garment bearing an infringing hangtag came into Derek Andrew's
20 | possession on or about May 9, 2005. It was a mesh-sequence lace-trimmed satin top, bearing
21 | Style Number 32412. The hangtags were applied to the garments in China. Shipping records
22 | indicate that this style was first shipped to Poof Apparel in January, 2005. *See* Ex. 21. A
23 | cease and desist letter was sent to Poof Apparel on May 17, 2005. According to Mr. Terzi,
24 | this was the first notice he had of the infringement at issue. He testified that he then called his
25 | Chinese agent and gave instructions to stop using the accused hangtag.

26 | (B) Poof Apparel received clothing deliveries from China in large shipping

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 7

01 | container quantities.

02 |     (C)    Derek Andrew obtained samples of other Poof Apparel garments bearing
03 | infringing hangtags. Each bore distinctive style numbers.

04 |     (D)    It is reasonable to assume that in light of failure of Poof Apparel to instruct its
05 | Chinese agent to cease using the infringing hangtags prior to June 2005, that Poof Apparel's
06 | Chinese factories would continue to ship samples prepared in the same way as earlier
07 | shipments.

08 |     (E)    There appears to have been approximately 2 shipments from China in January
09 | 2005 that included garments bearing a style or sample number that included the infringing
10 | hangtag, 1 shipment in February, 2 shipments in March, 2 shipments in April, and at least 1
11 | and perhaps 2 shipments in May 2005. Exs. 20, 21, 22, 23, 24, 25, 26, and 27.

12 |     (F)    At least 110 garments bearing the infringing hangtags were seen displayed in 2
13 | stores in the Seattle area. This does not include any garments that may have been held in
14 | inventory at any of the stores but not yet displayed. These 2 stores alone would represent
15 | approximately 3% of the 3,750 total garments asserted by Poof Apparel as representing the
16 | universe of garments sold with an infringing hangtag. This does not take into account other
17 | Seattle-area retail outlets of these stores, nor the fact that most of Poof Apparel's business is
18 | done on the East Coast.

19 |     33.    From documents that were received into evidence, particularly the Poof
20 | Apparel garments that were received which bore a specific style or sample number, and tying
21 | that information into order charts, delivery charts, and invoices from 2005, *see* Exs. 20-29, 31,
22 | 33-39, 48, 50-51, 54-57, it is possible to determine the sales of garments that included the
23 | infringing hangtags, as well as the wholesale prices and accompanying expenses of those
24 | garments. Exhibit 71, a cropped capri-length, coin-pocketed pant bearing an infringing
25 | hangtag, was sold under Style Number 33468. Exhibit 72, a similar capri pant bearing an
26 | infringing hangtag, was sold under Style Number 31350. Exhibit 74, a cropped jacket with

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 8

01  ruffled detail bearing an infringing hangtag, was sold under Style Number 31341. Exhibits 65
02  and 67, which are cropped capri pants with side floral embroidery bearing infringing hangtags,
03  were sold under Style Number 33423. Exhibit 72, a short-length hooded sweat jacket bearing
04  an infringing hangtag, was sold under Style Number 31469. Exhibit 69, a mesh-sequence
05  lace-trimmed satin top bearing an infringing hangtag, was sold under Style Number 32412.
06  Exhibit 11, a bra tank with antique lace bearing the infringing hangtag, was sold under Sample
07  Number 12111. Exhibit 61, a long pant with side and back embroidery bearing the infringing
08  hangtag, was sold under Style Number 43511. Exhibit 13, a stretch satin top with lace trim
09  and asymmetrical hem bottom bearing the infringing hangtag, was sold under Style Number
10  32392. Exhibit 16, is a tricot long pant with side stripes bearing the infringing hangtag, was
11  sold under Style Number 31356. Exhibit 7, a ribbed cotton tank top with front and back floral
12  embroidery bearing the infringing hangtag, was sold under Style Numbers 32415 and CD181.

13       34.    Also identified by Poof Apparel's order charts, delivery charts, and invoices
14  are garments which bear similar, if not identical, descriptions, prices, and costs to the units
15  mentioned above. The Court will call these garments "related styles," to the extent they are
16  virtually identical garments shipped in the same order as their main (exhibited) garment.
17  These related styles include Sample Number 8891 and Style Number 41350, both of which are
18  capri-length, coin-pocketed pants related to Style Number 33468 (Ex. 71); Style Number
19  32413, a light weight tank with contrasting lace trim related to Style Number 32412 (Ex. 69);
20  Sample Number 3011, a short-length hooded sweat jacket identical to Style Number 31469
21  (Ex. 72); and Style Number 43351, a reorder of a sweat jacket very similar to Style Number
22  31469 (Ex. 72) and Sample Number 3011.

23       35.    No documents received into evidence reflect specific price figures for Style
24  Number 31356 (Ex. 16, the striped tricot long pant) or Style Number 32415/CD181 (Ex. 7,
25  the ribbed cotton tank top with floral embroidery). However, because each of these garment
26  units unquestionably bore the infringing hangtag, and were comparable in style to certain of

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 9

01 | the above mentioned units. the Court is able to extrapolate the price of these garments by
02 | reference to similarly-styled pants and tops made by Poof Apparel, as noted by citation to
03 | certain exhibit numbers in the chart below.

04 |     36.    Based on the shipment records and invoices, the Court finds that Poof Apparel
05 | made the following sales of garments that included the infringing hangtag from January to
06 | May, 2005:

| Style/Sample # | # of Orders | Wholesale Price | Revenue |
|---|---|---|---|
| 33468 | 12,432 (Exs. 24, 27) | $ 6.20 (Exs. 34, 36, 37, 38) | $ 77,078.40 |
| 31350 | 15,792 (Exs. 20, 21, 22) | $ 6.52 (Ex. 33) | $ 102,963.84 |
| 41350 | 13,200 (Ex. 27) | $ 6.20 (Exs. 34, 36, 37, 38) | $ 81,840.00 |
| 8891 | 7,200 (Ex. 24) | $ 6.20 (Exs. 34, 36, 37, 38) | $ 44,640.00 |
| 31341 | 1,980 (Ex. 20) | $ 6.25 (Exs. 34, 36, 37) | $ 12,375.00 |
| 33423 | 16,730 (Exs. 21, 24, 26) | $ 5.35 (Ex. 31) | $ 89,505.50 |
| 31469 | 8,940 (Exs. 24, 27) | $ 6.29 (Exs. 34, 36, 37, 38) | $ 56,232.60 |
| 43351 | 8,750 (Ex. 27) | $ 6.52 (Ex. 33) | $ 57,050.00 |
| 3011 | 7,200 (Ex. 25) | $ 6.52 (Ex. 33) | $ 46,944.00 |
| 32412 | 4,500 (Ex. 21) | $ 8.00 (Ex. 48) | $ 36,000.00 |
| 32413 | 4,700 (Ex. 21) | $ 3.50 (Exs. 54, 55) | $ 16,450.00 |
| 12111 | 47,316 (Exs. 20, 21, 26) | $ 4.81 (Exs. 50, 51) | $ 227,589.96 |
| 43511 | 3,750 (Ex. 27) | $ 6.25 (Ex. 31) | $ 23,437.50 |

| | | | |
|---|---|---|---|
| 32392 | 5,100<br>(Ex. 20) | $ 7.53<br>(Exs. 56, 57) | $ 38,403.00 |
| 31356 | 4,338<br>(Exs. 20, 21) | $ 5.35<br>(Ex. 31) | $ 23,208.30 |
| 32415/<br>CD181 | 27,180<br>(Exs. 21, 22, 25) | $ 3.50<br>(Exs. 54, 55) | $ 95,130.00 |
| **TOTAL** | | | **$ 1,028,848.10** |

37.     At trial, Mr. Terzi testified that Poof Apparel's profits for the year 2005 on sales of approximately $21 million were $960,000.  He also testified that Poof Apparel's profit margins were 7 to 8%.  His testimony was not supported by any competent evidence. Indeed, Mr. Terzi stated this was based only on his recollection of what his accountant told him.  He was unable or unwilling to identify specific offsets from revenue or to define what was included in his "profits" calculation.  Although Poof Apparel was asked repeatedly to produce documents identifying expenses associated with its business, it failed to do so. Indeed, Poof Apparel went out of its way to delete certain cost information.  *See, e.g.*, Exs. 20, 21, 22, 24, 26, and 27.  However, some information was provided which enables the Court to determine the cost of the product from Poof Apparel's Chinese suppliers.  Where this information has been provided, it is an appropriate offset from the revenues set forth above. Where it has not been provided, Poof Apparel should not receive a deduction; such is the case for Style Numbers 41350, 43511 and 32392, and Sample Number 12111.  The failure of Poof Apparel to provide this information was willful, and Poof Apparel will not be rewarded for these litigation tactics.  However, similar to the above estimations regarding wholesale prices, where certain garments have no information with respect to cost, but are very similar to garments that do, the Court has extrapolated cost figures from such units.  Deductible expense information that can be gleaned from the records list as follows:

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 11

| Style/Sample | # of Orders | Revenue | Expenses | Deduction | Adjusted Total |
|---|---|---|---|---|---|
| 33468 | 12,432 | $ 77,078.00 | $ 3.15 (Ex. 25) | $ 39,160.80 | $ 37,917.20 |
| 31350 | 15,792 | $ 102,963.84 | $ 3.35 (Ex. 23) | $ 52,903.20 | $ 50,060.64 |
| 41350 | 13,200 | $ 81,840.00 | n/a | Ø | $ 81,840.00 |
| 8891 | 7,200 | $ 44,640.00 | $ 3.15 (Ex. 25) | $ 22,680.00 | $ 21,960.00 |
| 31341 | 1,980 | $ 12,375.00 | $ 3.35 (Ex. 23) | $ 6,633.00 | $ 5,742.00 |
| 33423 | 16,730 | $ 89,505.50 | $ 3.00 (Ex. 25) | $ 50,190.00 | $ 39,315.50 |
| 31469 | 8,940 | $ 56,232.60 | $ 3.90 (Ex. 25) | $ 34,866.00 | $ 21,366.60 |
| 43351 | 8,750 | $ 57,050.00 | $ 3.90 (Ex. 25) | $ 34,125.00 | $ 22,925.00 |
| 3011 | 7,200 | $ 46,944.00 | $ 3.90 (Ex. 25) | $ 28,080.00 | $ 18,864.00 |
| 32412 | 4,500 | $ 36,000.00 | $ 2.00 (Ex. 25) | $ 9,000.00 | $ 27,000.00 |
| 32413 | 4,700 | $ 16,450.00 | $ 2.00 (Ex. 25) | $ 9,400.00 | $ 7,050.00 |
| 12111 | 47,316 | $ 227,589.96 | n/a | Ø | $ 227,589.96 |
| 43511 | 3,750 | $ 23,437.50 | n/a | Ø | $ 23,437.50 |
| 32392 | 5,100 | $ 38,403.00 | n/a | Ø | $ 38,403.00 |
| 31356 | 4,338 | $ 23,208.30 | $ 3.00 (Ex. 25) | $ 13,014.00 | $ 10,194.30 |
| 32415/ CD181 | 27,180 | $ 95,130.00 | $ 1.60 (Ex. 25) | $ 43,488.00 | $ 51,642.00 |
| **TOTAL PROFITS** | | | | | **$ 685,307.70** |

38.     Poof Apparel continued to sell garments bearing the infringing hangtag even after receipt of the May 17, 2005 cease and desist letter.  This is evidenced by the fact that

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 12

01  Poof Apparel did not pull any garments from its warehouse after receipt of the cease and
02  desist letter, that garments were either likely on a ship coming to the United States or soon to
03  be shipped to the United States at the time of receipt of the cease and desist letter, and that
04  there exist invoices which indicate sales of garments bearing style numbers that included the
05  infringing hangtags. *See, e.g.*, Exs. 31, 34, 37, 38, and 55.

06    39.    Poof Apparel distributed garments bearing the infringing hangtags to its
07  customers from its warehouse after the effective date of the Derek Andrew copyright
08  registration. *Compare* Amended Complaint, Ex. B, *with* Exs. 31, 34, 37, 38, 55. This was
09  done by Poof Apparel with reckless disregard of Derek Andrew's copyright rights.

10    40.    Mr. Kaplan's assurances to Derek Andrew were made with no intention of
11  carrying out the representations other than to cease production of the infringing hangtag. Poof
12  Apparel did not contact any of its distributors to remove infringing hangtags. It did not
13  remove infringing hangtags from its inventory stored in its warehouse. Poof Apparel's
14  claimed difficulty in being able to find any such garments is belied by its ability to locate a
15  sample that its counsel could send to Derek Andrew. Ex. 105. As a lower-end retailer, Poof
16  Apparel simply did not want to take the effort to contact distributors or to go through products
17  in its warehouse to remove the infringing hangtags. It has fast-moving business lines. Instead
18  of making the effort to remove the infringing hangtags, Poof Apparel simply instructed its
19  Chinese agent to make sure that no further hangtags were included in future shipments,
20  provided assurances that it knew to be false to Derek Andrew that it was removing the
21  garments from distribution, and did nothing, hoping its products in the pipeline would sell out
22  quickly.

23    41.    Poof Apparel's profits on the garments sold bearing the infringing hangtags
24  was $685,307.70. This is an exceptional case in light of Poof Apparel's conduct after it was
25  notified of the infringing hangtags. Disgorgement of profits is the appropriate measure of
26  damages that should be awarded to plaintiff for its Lanham Act and Washington State

01 | Consumer Protection Act claims. Profit disgorgement is an appropriate remedy in this case,
02 | in light of the deliberate indifference and reckless disregard shown by Poof Apparel to the
03 | intellectual property rights of the plaintiff. The Court denies Derek Andrew's request to treble
04 | this amount. Instead, profit disgorgement adequately compensates the plaintiff for the injuries
05 | it has sustained and also achieves the deterrence purposes of the damages remedy provided by
06 | the Lanham Act, without providing a windfall to the plaintiff.

07 |         42.     Poof Apparel's distribution of garments from its warehouse after the effective
08 | date of the plaintiff's copyright registration also amounts to deliberate indifference and
09 | reckless disregard of the plaintiff's copyright. Plaintiff is entitled to statutory damages of
10 | $15,000 for this conduct. This sum represents the approximately twice the expense associated
11 | with the outside cost of development of the hangtag at issue, which will be used to estimate
12 | Derek Andrew's internal costs. Derek Andrew representatives testified that Poof Apparel
13 | would not have been licensed to use its product, and Poof Apparel has sold its products with
14 | hangtags. No competent evidence was offered by Poof Apparel as to the cost it has incurred
15 | in the past in developing its hangtags, and so it is appropriate to use the external and estimated
16 | internal costs of Derek Andrew to determine statutory copyright damages. The evidence on
17 | willfulness does not warrant granting the $150,000 "per infringement" in statutory damages
18 | requested by Derek Andrew, as the principal willfulness was demonstrated by Poof Apparel's
19 | unwillingness to correct matters and to try to deceive Derek Andrew after the garments were
20 | manufactured and shipped, as opposed to willfulness at the conception. Although the conduct
21 | and attempted deception of Poof Apparel after it received notice of the infringement cannot be
22 | condoned, Derek Apparel is appropriately compensated for its injuries by requiring the
23 | disgorgement of the profits on its Lanham Act claim and the award of damages representing
24 | the cost of hangtag design and implementation on the Copyright claim. To do anything else
25 | would be tantamount to a double recovery, which would not be justified by the policies behind
26 | the two statutory frameworks.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 14

01    43.    Derek Andrew is entitled to its reasonable attorneys' fees under both the
02 Lanham Act and the Copyright Act. In this case, Derek Andrew was required to retain
03 counsel in order to protect its intellectual property rights, and this case became increasingly
04 expensive as a direct result of the recalcitrance of the defendant and its counsel.

05    44.    Derek Andrew's fee request seeks the award of $449,358.00 in attorneys' fees
06 and $30,186.19 in costs, for a total of $479,554.19. Dkt. No. 89. Unfortunately, its fee
07 petition consisted principally of its counsel's billing statements to Derek Andrew. *See id.*
08 Moreover, this was not complete when filed. *See* Dkt. No. 90 and 91. The motion does not
09 attempt to set out what costs are actually permissible under 28 U.S.C. § 1920. Nor does the
10 fee request set forth a proper framework for the award. Instead, this task is left to the Court.
11 This has left the Court with a task that has taken longer than the trial took in this case. The
12 plaintiff bears the burden of establishing the appropriateness of its fee request. Hence, if there
13 are questions, they will be resolved against the plaintiff. *Hensley v. Eckerhart*, 461 U.S. 424,
14 433 (1983).

15    45.    In *Hensley*, the United States Supreme Court established that in fee-shifting
16 cases, the basis of a fee award is the "lodestar" method, under which the number of hours
17 reasonably expended is multiplied by the applicable hourly market rate for the legal services.

18    46.    Reasonable Hours: In *Hensley*, the Court stated that counsel are expected to
19 exercise "billing judgment" and that district courts "should exclude from this initial fee
20 calculation hours that were not 'reasonably expended,'" including "excessive, redundant, or
21 otherwise unnecessary" work. *Id.* at 434.

22    47.    The plaintiff's fee request is excessive. There is substantial duplication of
23 efforts and multiple attorney conferencing. The bulk of the fees in this case were incurred
24 after a default was entered against Poof Apparel. Some of these fees are justified, in light of
25 the recalcitrance demonstrated by Poof Apparel. Nevertheless, a default was entered against
26 the defendant Poof Apparel on August 8, 2005. Dkt No. 8. Through the end of September,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 15

01 | 2005, the plaintiff had incurred attorneys' fees and costs of $34,409.39. *See* Dkt. No. 89-1, ¶
02 | 9. It is difficult to understand how an additional approximately $445,000 could be spent
03 | without unnecessary duplication. Unfortunately, the plaintiff's fee petition does not permit
04 | the Court to easily make a determination of this issue.

05 | 48.   Hourly Rates: The hourly rates of the attorneys involved are set forth in
06 | Paragraph 7 of the fee petition. The defendant does not challenge the hourly rates. The Court
07 | finds the hourly rates to be reasonable, with the possible exception of the rates for the services
08 | described of Mr. Diets and Mr. Karanjia. A final determination depends, in part, on an
09 | analysis of the work performed by the individuals. If, for example, Mr. Diets is performing
10 | work as a partner that is associate-type work, then the defendant should not be charged with
11 | paying the rate of $460 per hour. This is not meant to devalue the contribution of Mr. Diets
12 | relative to the result obtained. Instead, it appears that Mr. Diets was the point-person for the
13 | client, performing a valuable contribution for Derek Andrew relating to ongoing
14 | communications and coordinating matters with the client. However, this does not mean that
15 | the defendant should be responsible for these costs. The present petition makes it difficult to
16 | make an assessment, and further information will be required as set forth below.

17 | 49.   To assist the Court, the plaintiff will supplement its fee petition within 14 days.
18 | This supplement will include a summary of the hours that each attorney worked for each
19 | month for the statements previously provided to the court. The summary will also include a
20 | summary of the work, broken down monthly by each attorney for (1) time spent up to the time
21 | that default was entered against Pool Apparel; (2) time spent in discovery and settlement
22 | efforts against the non-Pool Apparel defendants; (3) time spent on discovery against Pool
23 | Apparel; (4) time spent on motions practice, specifically setting forth the various motions;
24 | and (5) time spent on trial. To the extent that time entries included activity of more than two
25 | attorneys on a given day, an explanation as to why that should not be considered duplicative
26 | will also be provided. In addition, further explanation as to the justification of the rates for the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 16

01 | specific services provided by Mr. Diets and Mr. Karanjia will also be provided.

02 |      50.     The plaintiff has also failed to provide justification for most of the costs that
03 | are included in its fee application. Instead, it has submitted only the bills that it sent its client.
04 | The Court does not take the position that these costs are not the proper subject of client
05 | reimbursement. However, the majority of these costs are not properly awardable as costs
06 | under 28 U.S.C. § 1920 or as costs otherwise awardable under the Lanham Act and Copyright
07 | Act. Due to the failure to segregate costs that are properly awarded from those that are not,
08 | the supplemental fee petition will include a summary of *only* the following costs, which will
09 | be the *only* costs awarded: (1) filing fee, including any filing fee in New York that may have
10 | been necessary for discovery purposes; (2) service of fees (messenger fees are not filing fees);
11 | (3) witness fees, if any; and (4) the stenographic fees of the court reporter for the deposition of
12 | Mr. Terzi. No other costs will be allowed.

13 | ## CONCLUSIONS OF LAW

14 |      1.     The Court has general and specific personal jurisdiction over Poof Apparel
15 | because it conducted substantial business in this jurisdiction or otherwise purposely availed
16 | itself of the benefits and protections of the forum state, and the alleged cause of action arose
17 | out of Poof Apparel's forum-related activities. *Bancroft & Masters, Inc. v. Augusta Nat'l,*
18 | *Inc.*, 223 F.3d 1082, 1086-87 (9th Cir. 2000).

19 |      2.     The Court has subject matter jurisdiction over plaintiff's federal trademark and
20 | copyright claims pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Court exercises
21 | supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22 |      3.     Venue is proper under 28 U.S.C. §§ 1391(b)-(c) and 1400(a).

23 |      4.     Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this
24 | matter tried by the undersigned Magistrate Judge.

25 |      5.     As set forth above, default was entered against Poof Apparel in this case. Dkt.
26 | No. 8. Because the well-pleaded allegations in the complaint regarding liability are taken as

01 true upon the entry of default, *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir.

02 2002), the Court must find willful trademark and copyright infringement, and violation of the

03 Washington Consumer Protection Act. Notwithstanding the operation of law in this regard, as

04 set forth above, the Court has also found that Poof Apparel acted willfully in distributing

05 garment bearing the Derek Andrew "Heart Design" mark, thereby infringing Derek Andrew's

06 trademarks, constituting a false designation of origin in violation of the Lanham Act, 15

07 U.S.C. § 1125(a)(1).

08       6.     The Court found that Poof Apparel distributed garments bearing a hangtag that

09 is an unauthorized copy of Derek Andrew's hangtag. Derek Andrew's hangtag is the subject

10 of a valid and subsisting copyright. The Copyright Registration Certificate is *prima facie*

11 evidence of the validity of the copyright and of the facts stated in the certificate. 17 U.S.C. §

12 410(c). As found by the Court, Poof Apparel distributed garments bearing the infringing

13 hangtag from its distribution warehouse after the June 15, 2005, the effective date of the

14 registration. Distribution is one of the exclusive rights of a copyright owner. 17 U.S.C. §

15 106(3). Poof Apparel's distribution of garments bearing an infringing hangtag from its

16 warehouse after June 15, 2005 constitutes an infringement of Derek Andrew's copyright.

17       7.     Poof Apparel's willful use of Derek Andrew's trademark to promote sales of

18 competing goods has a deleterious impact on the public interest and caused injury to Derek

19 Andrew's business and property, in violation of the Washington Consumer Protection Act,

20 R.C.W. § 19.86.020. *See Sleep Country USA Inc. v. Northwest Pacific Inc.*, 72 U.S.P.Q.2d

21 1261, 1267 (W.D. Wash. 2003).

22       8.     At any time before final judgment is rendered, § 504 of the Copyright Act

23 allows a plaintiff copyright owner to elect either actual or statutory damages for copyright

24 infringement. 17 U.S.C. § 504(c)(1). A copyright owner may choose to recover the actual

25 damages it has suffered as a result of the infringement, as well as any profits made by the

26 infringer, that are attributable to the infringement and are not taken into account in computing

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 18

01 the actual damages. 17 U.S.C. § 504(b). Copyright owners are entitled to recover any profits
02 that are attributable to the infringement, as long as the profits are not duplicative of the
03 copyright's owner actual damages. In the alternative, the copyright holder may elect to
04 recover statutory damages in lieu of other forms of monetary relief. Statutory damages may
05 be awarded in amounts of not less than $750 or more than $30,000 for each work infringed.
06 17 U.S.C. § 504(c)(1). Where the infringement was committed willfully, the Court may
07 increase the award of statutory damages to a maximum of $150,000 per each work infringed.
08 *Id.* § 504(c)(2).

09      9.     In this case, Derek Andrew has elected statutory damages under the Copyright
10 Act, and additionally argues that Poof Apparel committed the infringement willfully, thus
11 increasing the potential statutory award. *Id.* § 504(c)(2).

12      10.    The Copyright Act does not define "willful." Its determination is left for the
13 trier of fact. For the purposes of § 504(c)(2), copyright infringement is willful when the
14 defendant actually knew it was infringing the plaintiff's copyright or recklessly disregarded
15 that possibility. *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335-36 (9th Cir.
16 1990), *cert. denied*, 498 U.S. 1109 (1991); *Warner Bros. Entm't Inc. v. Caridi*, 346 F. Supp.
17 2d 1068, 1073 (C.D. Cal. 2004). Beyond the entry of default, the consequence of which
18 admits willful infringement as pleaded by the Derek Andrew, the Court finds that Poof
19 Apparel's copyright infringement was the result of reckless disregard of Derek Andrew's
20 copyright. *See supra* Findings of Fact ¶¶ 23, 25, 28, 31-32, 38-40.

21      11.    Section 504(c)(2) states that the Court may award enhanced statutory damages
22 of up to $150,000 for each copyrighted work infringed. 17 U.S.C. § 504(c)(2). At trial,
23 counsel for Derek Andrew argued that § 504(c)(2) authorized the Court to grant an award of
24 $3,300,000, which is the equivalent of the $150,000 maximum for 22 separate instances of
25 infringement. However, the legislative history of the Copyright Act indicates that for
26 purposes of calculating damages, "[a] single infringer of a single work is liable for a single

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 19

01 [award of statutory damages], no matter how many acts of infringement are involved in the
02 action." H.R. REP. NO. 94-1476, at 162, *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5778; *see*
03 *also Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990) ("Both the text of the
04 Copyright Act and its legislative history make clear that statutory damages are to be calculated
05 according to the number of works infringed, not the number of infringements.").

06       12.    An award of statutory damages for copyright infringement does not
07 automatically foreclose further monetary relief for trademark infringement. If a defendant
08 infringes upon a plaintiff's copyright and trademark, the plaintiff can recover *both* statutory
09 damages under the Copyright Act and actual damages under the Lanham Act. *See Nintendo of*
10 *America. Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994). In certain
11 circumstances, such a judgment is permissible because it effectuates the specific purposes
12 behind each award—statutory damages to penalize the willful copyright infringer and deter his
13 future conduct, and actual damages to compensate the trademark owner for its lost profits and
14 to prevent unjust enrichment of the infringer. *Id.* The Court finds that this is such a case.

15       13.    The Lanham Act, 15 U.S.C. § 1117(a), provides that a plaintiff is entitled,
16 "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages
17 sustained by the plaintiff, and (3) the costs of the action." In this case, Derek Andrew
18 produced no evidence of the actual damages it sustained, and therefore its damages for
19 trademark infringement derive solely from Poof Apparel's profits from its illegal activity. In
20 establishing Poof Apparel's profits, Derek Andrew bears the burden of proving only Poof
21 Apparel's sales; to reduce the potential award, Poof Apparel must prove any costs or
22 deductions from the gross sales figures established by Derek Andrew. *See* 15 U.S.C. §
23 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only;
24 defendant must prove all elements of cost or deduction claimed."). Further, the Court has the
25 discretion to adjust the plaintiff's amount of recovery if such amount is "either inadequate or
26 excessive." *Id.* Under appropriate circumstances, this includes "any sum above the amount

01 | found as actual damages, not exceeding three times such amount." *Id.*

02 |     14.    Under section 505 of the Copyright Act, the Court has the discretion to award
03 | attorneys' fees to a prevailing party in a copyright infringement case. 17 U.S.C. § 505; *see*
04 | *also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). In awarding fees under § 505, courts
05 | "may consider the following factors: (1) frivolousness; (2) motivation; (3) objective
06 | unreasonableness both in the factual and legal components of the case; (4) and the need in
07 | particular circumstances to advance the dual goals of compensation and deterrence."
08 | *Twentieth Century Fox Film Corp. v. Entertainment Distrib.*, 429 F.3d 869, 883 (9th Cir.
09 | 2005). The Lanham Act also permits an award of reasonable attorneys' fees to prevailing
10 | plaintiffs for violations of 15 U.S.C. § 1125(a) in "exceptional cases." 15 U.S.C. § 1117(a).
11 | A trademark case is "exceptional" when the infringement is "malicious, fraudulent, deliberate
12 | or willful." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993).

13 |     15.    This is an appropriate case for the award of attorneys' fees under both acts.
14 | However, as stated above, plaintiff is only entitled to reasonable attorney's fees and bears the
15 | burden of establishing the reasonableness of the fees requested. *See* Findings of Fact ¶¶ 44-
16 | 50.

17 |     16.    Permanent Injunction:  Finally, under both the Copyright Act and Lanham Act,
18 | a prevailing plaintiff is entitled to an injunction prohibiting the defendant from any further
19 | infringement of the plaintiff's trademarked and copyrighted material. 17 U.S.C. § 502(a); 15
20 | U.S.C. § 1116. The parties agree that a permanent injunction should be entered, *see* Dkt. No.
21 | 76 at 16-17, Dkt. No. 75 at 5, and the Court finds such relief appropriate in this case. The
22 | defendant, its officers, employees and agents, and all those operating in privity with the
23 | defendant are hereby PERMANENTLY ENJOINED from infringing the plaintiff's "Twisted
24 | Heart" hangtag that was the subject of this lawsuit and is the subject of United States
25 | Copyright Certificate No. VA 1-301-899.

26 |

01    DATED this 22nd day of December, 2006.

02    _____

03    JAMES P. DONOHUE
      United States Magistrate Judge
04

05

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 22